Filed 8/7/13  In re Lucas S. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re LUCAS S., a Person Coming Under the Juvenile Court Law. | B243948<br>(Los Angeles County<br>Super. Ct. No. CK83553) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HARVEY B.,<br><br>    Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Marguerite D. Downing, Judge.  August 1, 2012 order affirmed; appeal from July 2, 2012 order dismissed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

James F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Senior Associate County Counsel, for Plaintiff and Respondent.

_____

Harvey B. (Father) appeals from an August 1, 2012 juvenile court order denying Father's Welfare and Institutions Code section 388 petition.[1]  Father contends that the evidence was insufficient to support the court's July 2, 2012 order setting a section 366.26 hearing as to minor Lucas S., born in 2005.  Father also contends that he presented prima facie evidence to support an evidentiary hearing on his modification petition filed pursuant to section 388 and therefore the juvenile court's summary denial of his petition on August 1, 2012 was an abuse of discretion.  The Department of Children and Family Services (DCFS) filed a motion for dismissal of Father's purported appeal challenging orders and findings from the July 2, 2012 hearing.  DCFS also filed a motion for judicial notice of our prior opinion in *In re Lucas S*. (Sept. 22, 2011, B229906) [nonpub. opn.] (*Lucas I*) and the record regarding that matter pursuant to Evidence Code sections 452 and 459.  Father filed a "motion to strike [his] opposition to [DCFS's] partial motion to dismiss and permission to file an amended opposition to [DCFS's] partial motion to dismiss" and a motion to take judicial notice of an unrelated opinion in which our Supreme Court granted review and later transferred the matter to us with directions to vacate our decision and reconsider the cause.  Taryn S. (Mother) is not a party this appeal.

We grant DCFS's motion for dismissal of Father's purported appeal challenging orders and findings from the July 2, 2012 hearing because Father's notice of appeal states only that Father appeals from "[d]enial of 388 petition on August 1, 2012."  We grant DCFS's motion for judicial notice of our prior opinion, *Lucas I*, *supra*, B229906, and the record regarding that matter pursuant to Evidence Code sections 452 and 459.  We grant Father's motion to strike his opposition and file an amended opposition.  We deny Father's motion to take judicial notice of the superseded, unrelated opinion in which our Supreme Court granted review and later transferred the matter to us with directions to vacate our decision and reconsider the cause because it cannot be cited as authority.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

Because Father did not allege a prima facie showing of changed circumstances and that the proposed change would promote the best interests of Lucas, we conclude that the juvenile court did not abuse its discretion when it summarily denied Father's section 388 petition for modification on August 1, 2012. We affirm the order of the court.

**BACKGROUND**

The background of this matter has been well-documented in our previous opinion, *Lucas I*, *supra*, B229906. Briefly, on December 28, 2010, Father appealed from the juvenile court's October 28, 2010 jurisdictional and December 28, 2010 dispositional orders adjudging Lucas a dependent of the juvenile court pursuant to section 300, subdivision (b) (failure to protect). On September 22, 2011, we affirmed the orders of the court. (*Lucas I*.) As amended and sustained, paragraph b-1 of the petition alleged under section 300, subdivision (b) that "'[Father and Mother] had a sexual relationship which resulted in the birth of Lucas. [Father is Mother's] stepfather and served in a paternal relationship in her life and abused a position of trust as she resided in his home prior to her 18th birthday. There is a 30-year difference in their ages, and the relationship lasted for a substantial period of time. [¶] Lucas is a special needs child, and this relationship has caused Mother severe emotional and mental issues which endangers Lucas's physical and emotional health and safety and places [Lucas] at risk of physical and emotional harm, damage, danger and sexual abuse." (*Lucas I*, p. 9.) As sustained, paragraph b-3 of the petition alleged under section 300, subdivision (b) that Mother was unwilling and unable to provide Lucas with care. (*Lucas I*, p. 9.)

We affirmed the juvenile court's jurisdictional and dispositional orders removing Lucas from Father's custody and requiring Father to complete individual counseling with an emphasis on sexual abuse for perpetrators. (*Lucas I*, *supra*, B229906, pp. 2–3, 24.)

Subsequent to Father's appeal, on January 19, 2011, Father provided to DCFS a letter from an agency called Real Individuals Getting Help Today (RIGHT) that stated that Father had enrolled in a drug and alcohol program that included individual counseling sessions and parenting, anger management, and domestic violence classes. DCFS reported that Father had monitored visits with Lucas twice a week for two hours.

3

Lucas was stable, thriving, well-integrated into the foster home where he had been placed since August 6, 2010, and had demonstrated many positive changes, including becoming completely potty-trained and "continuing to learn many age appropriate self-care behaviors that he had previously been unable to accomplish on his own." Lucas's foster parents specialized in special needs children and were described as "patient, sensitive and . . . able to attend to the needs of their foster children." According to Lucas's therapist, Lucas had earlier demonstrated "aggressive and somewhat sexually suggestive play with dolls during a few play therapy sessions." But Lucas's "overall well-being has improved since residing with the foster family and . . . '[i]t is rare . . . to see a child thrive as well as Lucas has in this placement, but it is clear that he is not only getting his needs met, but emotionally he looks to [his foster parents] to offer him comfort and they offer him a security that he did not previously exhibit.'"

DCFS reported on June 28, 2011, that Father had attended parenting, anger management, and domestic violence classes and individual counseling sessions with RIGHT, but had not enrolled in sexual abuse counseling programs as ordered with RIGHT or any other agency. And Father made weekly complaints to DCFS about Lucas's "rashes and bug bites or other injuries that are non-existent." He told foster parent Mrs. N. that he had taken pictures of Lucas's "reported injury or rash and will bring it to Court." He also accused Mrs. N. of "harshly pulling Lucas by the arm when walking across the McDonald's parking lot." On being informed by DCFS of Father's accusation, Mrs. N. explained that she had to hold Lucas's arm tightly in the parking lot because he would pull away in his excitement at playing at McDonald's. DCFS counseled Father about the "impact of false allegations." During a November 2010 visit, Father whispered something in Lucas's ear that upset Lucas for the next 24 hours. And although DCFS explained to Father that he should talk to Lucas by telephone for five minutes two to three times per week, Father called Lucas daily and insisted on a 15-minute telephone conversation. Initially, it took Lucas over an hour "to calm down emotionally after every telephone call." Lucas also "very often [did] not wish to speak to [Father] after the initial 2-3 minutes." Father would then become angry and blame the

4

foster parents, who tried to "speak to Lucas to get him to continue his conversation with [F]ather." On June 6, 2011, Father told DCFS that "Lucas' only problems were because his mother got bored of taking care of him and if DCFS would just return him to [F]ather, where he belongs, Lucas would be fine." Father blamed Mother for DCFS's involvement; refused to acknowledge his role in contributing to the "instability in Lucas's life"; and refused to acknowledge that his attempts to sabotage Lucas's placement were detrimental to Lucas's well-being. On June 28, 2011, DCFS reported that "[i]t has become apparent that [Father] is not willing to put Lucas' needs above his own."

On June 28, 2011, the juvenile court ordered that Father's visits take place in a "therapeutic setting." On July 20, 2011, DCFS reported that RIGHT's staff were certified state drug and alcohol counselors but were not certified state therapists. RIGHT did not offer "DCFS approved individual counseling with a licensed therapist to address the case issues" and also could not monitor Father's visits. DCFS had provided DCFS-approved counseling referrals to Father, but instead he had enrolled with RIGHT, which Father claimed was paid for by his Veteran Administration benefits. On July 28, 2011, Father told DCFS that the "judge approved [my] sexual abuse counseling at [RIGHT]. . . . 'I already completed my individual counseling and anger management classes at [RIGHT] and there is no need for me to enroll into another program.'" DCFS received a letter from RIGHT dated July 25, 2011, that stated Father had "addressed issues pertaining to sexual abuse, inappropriate relationship, and abuse of a position of trust."

At a team decisionmaking meeting (TDM) in August 2011, DCFS recommended to Father that he enroll with a licensed therapist to address his sexual abuse issues as a perpetrator, as ordered by the juvenile court. DCFS provided Father with a list of counseling referrals. Father stated that he had completed individual counseling and was not interested in enrolling in another therapy program. In private, Father's counselor at RIGHT, Mr. Leslie Harris, told DCFS that he was "not comfortable confronting [F]ather and expressing his personal thoughts and concerns regarding the sexual abuse issue. Mr. Harris stated that he is not qualified to address the sexual abuse issue with [Father], and

5

he also agreed with [DCFS] that [Father] needs to be enrolled with a licensed therapist due to the seriousness of the case." At the TDM, Mrs. N. reported that Lucas was eight to ten pounds overweight and the pediatrician had recommend that Lucas's sugar intake be limited. Father was counseled to bring healthy snacks.

Later, Mrs. N. reported that Father made "empty promises" to Lucas, such as telling him that he would "be coming home in a month" and asking him how he wanted his room to be "decorated and colored" when he came home, negatively impacting Lucas's behavior and causing him to be aggressive, kicking, running into the street, and biting. Mrs. N. also reported that Father used profanities when he talked to Lucas on the phone. Lucas's therapist, Ms. Emily Ortiz, reported Lucas increased his aggressive and defiant behavior when Father began visiting more frequently and that Father demonstrated inappropriate behavior by making "undelivered promises." She recommended that Father continue to have monitored rather than unmonitored visits because he "appears not to address his case issues."

On September 29, 2011, DCFS reported that "since the onset of the case, [Father] has denied committing any wrongdoing by having sex with [Mother] when she was 16 years of age. [Father] is minimizing the sexual abuse issue, and he does not understand why [DCFS] gets the Court's involvement." Mother alleged that Father had repeatedly raped her since she was 16 years old and Father had used guns to threaten Mother if she disclosed the sexual abuse. DCFS recommended that Father be seen by a licensed therapist to address the sexual abuse issues. In October 2011, DCFS provided Father with a referral to Acacia Counseling Center for sexual abuse counseling for perpetrators. On October 13, 2011, Father attended an "in-take appointment" with Mr. Chris Muzalski, an intern who worked under the supervision of a licensed therapist, but missed his first counseling appointment.

On December 8, 2011, Muzalski sent a letter to DCFS that stated that at his first appointment with Father on October 18, 2011, Father had denied Mother's allegations of being raped and held hostage by Father, "claim[ing] she was trying to get back at him because he caught her seeing other men and stopped giving her money." Father was

6

"very critical of DCFS, social workers, and society in general . . . [and] he believed that all he had to do was just attend counseling and then he could obtain custody of his son." Father stated his "relationship with [Mother] was a mistake." He claimed his addiction to pain medication had affected his thinking and judgment. A progress report on January 23, 2012, from Muzalski indicated that "[i]t took us seven sessions" for Father to realize "(maybe a moment of insight) that he violated boundaries that have had hurtful, emotional repercussions in the family." Further, Father "presented as truly remorseful and reported that he had apologized to his daughter Danielle for his poor choices and inappropriate behavior." Muzalski stated that "[w]hen [Father] speaks of Lucas he appears to be expressing genuine feelings of love and concern. It is possible that some of his unreasonable behavior/attitude may be out of a sincere concern for his son. It may be beneficial for [Father] and Lucas to be in counseling together and obtain feedback about how they behave when together." Father missed a subsequent appointment.

On March 7, 2012, Muzalski reported that after 10 sessions, Father "has sincerely and honestly realized the problems associated with his relationship with [Mother]. He genuinely understands the social standards and boundaries that he violated. I believe he is truly remorseful and more empathic for those (family) affected by his behavior." Muzalski reported that "[i]t is quite possible that [Father] always felt guilty about his sexual relationship with [Mother]." Muzalski stated, "My impression is that the sexual relationship with [Mother] is not representative or typical of [Father's] behavior. He may have had problems with women in his life, but they were all adult wife relationships. (I believe he has been married three times.) This time in his life may be more representative of a passing episodic event, not a chronic or habitual behavioral pattern. My sense is that [Father] has genuinely realized his violation and recognizes the need to improve and maintain boundaries and continue working on increasing self-awareness and decreasing defensiveness. [¶] In our sessions [Father] has regularly expressed his concerns for his son Lucas. This concern appears heartfelt and genuine. He reports that he has raised Lucas for most of his life (4-5 years). [Mother] abandoned Lucas to DCFS. My impression is that this case has more to do with the immature family dynamics in

7

which an episodic inappropriate sexual behavior occurred—the sexual behavior is not the main defining dynamic. It is the immature defensive behaviors that need addressing. Thus, I believe [Father] is very low risk for sexually harming Lucas and probably low risk for directly or intentionally harming Lucas in general."

On May 15, 2012, Muzalski reported that Father had not attended counseling since his last session on March 6, 2012; Father had scheduled an appointment in May "because the judge was requesting an explanation as to how he came to reassess the relationship with [Mother]" but missed it; and Father "has been inconsistent in attending his weekly individual counseling and is making it difficult to work on or address issues." On May 23, 2012, Muzalski reported that Father had attended an appointment that day. Father had complained that Mrs. N. should not have told Lucas that he was five pounds overweight after a doctor's visit and that she does not "understand autism."

In a letter dated June 22, 2012, Muzalski stated that Father's "attendance significantly improved." He stated that Father had made an "insightful acknowledgment of the truths of the social and personal role position in the relationship to [Mother] and the fact of the age difference that exists. When he reached this understanding he verbalized the realization that he, as the stepfather and as the adult, had a moral responsibility to maintain a social and personal boundary, regardless of what [Mother] did or said. [¶] I believe that the self-examination, insights and understanding [Father] has achieved have resulted in a stable change in his attitude about [Mother] and his family in general." Muzalski opined that Father expressed "a strong emotional tie with [Lucas]. Even though the relationship with [Mother] demonstrated bad judgment I don't believe that this has distracted him from loving, caring for and protecting Lucas. [¶] I believe that [Father] at this point desires to appropriately be a father and provide Lucas with a safe and secure home environment." Muzalski provided DCFS with a letter Father addressed to Mother that stated "how very sorry I am putting you and everyone else thru hell, it's not right and it's all my fault if I would have been using my mind nun [*sic*] of this would of even started. I did something in my life that I had never even thought of doing and shall never do again. But that is no way of saying how very sorry I am, I was

8

wrong in what I did, all the things that we talked about having a family and a house should have never been talked about. I let my guard down and let evil in, this hole [*sic*] thing is my fault and I am so sorry that I let it happen, and I hope you can find it in your heart to forgive me someday . . . it hurts me every time my little boy ask's [*sic*] me when can [he] come home . . . I hope someday he can forgive me to [*sic*]?"

In the meantime, DCFS reported on March 13, 2012, that Father had been visiting Lucas at DCFS's office once a week for an hour and a half. Lucas appeared "comfortable and bonded with [Father]. [Father] and child would play with Thomas the Train and [munch] on snacks. [Father] and child appeared interacting appropriately. They talked and laughed during play time." DCFS reported that Lucas continued to thrive in his placement with Mrs. N. and improved in his social, academic, and behavioral skills. Lucas had become more verbal, used simple sentences to express himself, answered simple questions, had become completely toilet trained, could wash his hands, could write his name, recognized primary colors and shades, and improved in his ability to follow directions. In a June 29, 2012 last minute information to the juvenile court, DCFS reported that Father had interacted appropriately with Lucas during two-hour monitored visits three times a week. DCFS continued to recommend that Father's family reunification services be terminated.

DCFS reported that Mother "strongly oppos[ed]" placing Lucas with Mother's half sister Danielle L. and her wife Rachel L. Mother stated, "'I handed my son to you guys to help me protect Lucas from them. I don't trust them. They are easily being manipulated by [Father]. [Father] will over power them with his mind games and control. I know them very well. They are not going to protect my son. . . . My son will be abused and neglected if he is under their care. My son has made significant improvement with all areas since he lives with the foster mother. I do not want to see him developmentally, physically, and emotionally regresses [*sic*]. . . . Danielle and Rachel do not have the parenting skills and knowledge to take care of my son's special needs. . . . Danielle did not protect me when I was under her care and supervision. When

9

I was 17 years old, I told Danielle that I was raped by [Father]. Danielle did not do anything to protect me. She continued to allow [Father] to sexually molesting [*sic*] me.'"

The parties did not call witnesses at the July 2, 2012 contested section 366.22 hearing. The juvenile court found by a preponderance of evidence that, among other things, continued jurisdiction was necessary; return of Lucas to Father or Mother would create a substantial risk of detriment to the physical and emotional well-being of Lucas; Lucas's placement was necessary and appropriate; Father was not in compliance with the case plan; the permanent plan of planned permanent living arrangement with foster care and a specific goal of adoption was appropriate; Lucas could not be returned to the physical custody of Mother and Father; and there existed no substantial probability Lucas would be returned within six months. The court ordered termination of family reunification services for Mother and Father and set the section 366.26 hearing for October 29, 2012.

On July 3, 2012, Father filed a notice of intent to file a writ petition with respect to the juvenile court's July 2, 2012 order setting a hearing under section 366.26. On August 6, 2012, Father filed a petition for an extraordinary writ in this court; DCFS filed an answer on August 16, 2012; and we denied the petition on August 31, 2012.[2]

On July 12, 2012, ten days after the section 366.22 hearing, Father filed a section 388 petition, requesting that the juvenile court order Lucas returned to Father, or "[i]n the alternative, grant Father additional reunification services and unmonitored visitation (unrestricted to just once every other week), including overnights." Father alleged as a change of circumstance that he had completed his sexual abuse counseling with his licensed therapist and alleged that the change in order would be in the best interests of Lucas because "Father visits Lucas on a regular basis and the visits all go well. Lucas is very bonded to his Father and it is in his best interest to be returned to his Father's care." Father attached a letter dated July 3, 2012, from Muzalski. Muzalski opined that Father had been able to drop his defenses and take responsibility for his poor judgment and

---

[2] We take judicial notice of the record in *Harvey B. v. Superior Court* (B242778) pursuant to Evidence Code sections 452 and 459.

10

misbehavior with Mother. Muzalski also opined that Father reached the goal of "insightful realization that he, as the adult and stepfather, violated serious boundaries regardless of what [Mother] did or did not do"; "[i]t is a marker that represents a completion of dealing with his relationship with [Mother] and any sexual issues"; and "I believe that the sexual misconduct counseling has been successfully completed."

On August 1, 2012, the juvenile court denied Father's section 388 petition without a hearing, finding Father did not state new evidence or change of circumstance and the best interest of Lucas would not be promoted by the proposed change of order. On September 5, 2012, Father appealed from the court's "[d]enial of 388 petition on August 1, 2012."

<strong>DISCUSSION</strong>

## A. The motions

DCFS filed a motion for dismissal of Father's purported appeal challenging orders and findings from the July 2, 2012 hearing. DCFS also filed a motion for judicial notice of our prior opinion, *Lucas I*, *supra*, B229906, and the record regarding that matter pursuant to Evidence Code sections 452 and 459. Father filed a "motion to strike [his] opposition to [DCFS's] partial motion to dismiss and permission to file an amended opposition to [DCFS's] partial motion to dismiss" and a motion to take judicial notice of a superseded, unrelated opinion in which our Supreme Court granted review and later transferred the matter to us with directions to vacate our decision and reconsider the cause.

We grant DCFS's motion for partial dismissal of Father's appeal because Father's notice of appeal states only that Father appeals from a "[d]enial of 388 petition on August 1, 2012." Father claims that he may challenge the July 2, 2012 order terminating reunification services and setting the permanency planning hearing because he satisfied the requirements of section 366.26, subdivision (*l*)(1)(A) to (C) in that he filed a timely writ petition; the writ petition substantively addressed the specific issues to be challenged and supported that challenge by an adequate record; and the writ petition was summarily denied. (§ 366.26, subd. (*l*)(1)(A)–(C).) But although Father satisfied the requirements

11

of section 366.26, subdivision (*l*)(1)(A) to (C) and therefore the July 2, 2012 order by the court setting a section 366.26 hearing was made appealable, Father failed to file a notice of appeal as to that order. (*In re Miracle M.* (2008) 160 Cal.App.4th 834, 846 [notice of appeal must include the order appealed from].) Accordingly, that part of Father's appeal purporting to appeal from the July 2, 2012 order is dismissed.

We grant DCFS's motion for judicial notice of our prior opinion, *Lucas I*, *supra*, B229906, and the record regarding that matter pursuant to Evidence Code sections 452 and 459. We grant Father's motion to strike his opposition and to file an amended opposition. We deny Father's motion to take judicial notice of *In re David R.* (2012) 212 Cal.App.4th 576, review granted March 13, 2013, S208475, matter transferred June 12, 2013, with directions to us to vacate our decision and to reconsider the cause in light of *In re I.J.* (2013) 56 Cal.4th 766, because *In re David R.* cannot be cited as authority.

**B. The juvenile court did not abuse its discretion in summarily denying Father's section 388 petition**

Father contends that he presented prima facie evidence to support an evidentiary hearing on his modification petition filed pursuant to section 388 and therefore the juvenile court's summary denial of his petition was an abuse of discretion. We disagree.

Section 388, subdivision (a)(1) states in relevant part: "Any parent or other person having an interest in a child who is a dependent child of the juvenile court . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court. The petition shall . . . set forth in concise language any change of circumstance or new evidence that is alleged to require the change of order or termination of jurisdiction." Section 388, subdivision (d) provides: "If it appears that the best interests of the child . . . may be promoted by the proposed change of order, . . . recognition of a sibling relationship, termination of jurisdiction, or clear and convincing

12

evidence supports revocation or termination of court-ordered reunification services, the court shall order that a hearing be held and shall give prior notice . . . ."

"[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition." (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) "The prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*Ibid.*) We review the juvenile court's order for abuse of discretion. (*Id.* at p. 808.)

We conclude the juvenile court did not abuse its discretion by summarily denying Father's section 388 petition without a hearing. Our review of Father's section 388 petition shows that he merely alleged general, conclusory allegations, which fail to establish a prima facie showing. (*In re Edward H.* (1996) 43 Cal.App.4th 584, 593.) At the July 2, 2012 hearing, the court found by a preponderance of evidence that, among other things, continued jurisdiction was necessary; return of Lucas to Father or Mother would create a substantial risk of detriment to the physical and emotional well-being of Lucas; Lucas's placement was necessary and appropriate; Father was not in compliance with the case plan; the permanent plan of planned permanent living arrangement with foster care and a specific goal of adoption was appropriate; Lucas could not be returned to the physical custody of Mother and Father; and there existed no substantial probability Lucas would be returned within six months.

Father's section 388 petition alleged as a change of circumstance that he had completed his sexual abuse counseling with a licensed therapist. Father also attached a letter dated July 3, 2012, from Muzalski, in which Muzalski opined that Father had been able to drop his defenses and take responsibility for his poor judgment and misbehavior with Mother and stated, "I believe that the sexual misconduct counseling has been successfully completed." But Muzalski's July 3, 2012 letter did not add materially to the information that the court had before it on July 2, 2012, when it terminated family reunification services and set the matter for a section 366.26 hearing. While the July 3,

13

2012 letter of Muzalski opined that Father had reached the goal of "insightful realization that he, as the adult and stepfather, violated serious boundaries regardless of what [Mother] did or did not do"; "[i]t is a marker that represents a completion of dealing with his relationship with [Mother] and any sexual issues"; and "I believe that the sexual misconduct counseling has been successfully completed," the letter did not significantly differ from Muzalski's letter of June 22, 2012, in which he opined that Father had realized "that he, as the stepfather and as the adult, had a moral responsibility to maintain a social and personal boundary, regardless of what [Mother] did or said"; that Father had achieved "a stable change in his attitude about [Mother] and his family in general"; and that Father cared for and loved Lucas and wanted to "provide Lucas with a safe and secure home environment."

And even though he had been provided with the names of DCFS-approved programs, Father had been resistant to following the court's December 2010 order to enroll in sexual abuse for perpetrators therapy, claiming in July 2011 that the "judge approved [my] sexual abuse counseling at [RIGHT]. '. . . I already completed my individual counseling and anger management classes at [RIGHT] and there is no need for me to enroll into another program.'" Thus, he did not enroll in a program with Acacia Counseling Center until October 2011. Even then, his attendance at counseling sessions was inconsistent until the court requested an explanation as to how Father came to reassess his relationship with Mother and the time for the section 366.22 hearing drew near.

"[U]p until the time the section 366.26 hearing is set, the parent's interest in reunification is given precedence over the child's need for stability and permanency." (*In re Marilyn H*. (1993) 5 Cal.4th 295, 310.) After termination of reunification services, it is presumed that continued care is in the best interests of the child. (*Ibid*.) The petition did not establish a prima facie case that a change in the order would be in Lucas's best interests. The petition alleged in a conclusory fashion that Father visits Lucas on a regular basis, the visits all go well, Lucas is very bonded to Father, and it is in Lucas's best interest to be returned to Father's care.

14

Throughout the dependency proceeding, Father demonstrated a lack of understanding of Lucas's needs and refused to acknowledge his role in contributing to the instability in Lucas's life. In June 2011, Father told DCFS that Lucas's problems were a result of Mother getting "bored of taking care of him and if DCFS would just return him to [F]ather, where he belongs, Lucas would be fine." What is more, Father had made weekly complaints to DCFS about rashes and nonexistent injuries sustained by Lucas, complained about Mrs. N.'s handling of Lucas in a MacDonald's parking lot, and complained about Mrs. N.'s recommendation to adhere to the pediatrician's advice that Lucas eat healthy snacks. In November 2010, Father whispered something into Lucas's ear, causing him to become upset for the next 24 hours; made empty promises to Lucas that he could not fulfill, causing Lucas to become upset; and did not follow DCFS's recommendations regarding the length and number of telephone calls to Lucas. He also used profanity when he was on the telephone with Lucas. And in June 2011, DCFS reported that Father was unwilling to put Lucas's interests above his own. On the other hand, Lucas had thrived under the loving and supportive care of Mrs. N., who was trained in special needs children. In her care, Lucas's aggressive behavior had diminished; Lucas had become more verbal, used simple sentences to express himself, answered simple questions, had become completely toilet trained, could wash his hands, could write his name, recognized primary colors and shades, and improved in his ability to follow directions.

Father has not shown how Lucas's best interests would be served by depriving him of a permanent, stable home in exchange for an uncertain future.

We conclude that Father did not establish a prima facie showing of change of circumstances and that a change of order would be in the best interests of Lucas. Accordingly, we conclude that the juvenile court did not err in denying Father a hearing on his section 388 petition.

# DISPOSITION

The juvenile court's August 1, 2012 order denying Harvey B.'s Welfare and Institutions Code section 388 petition is affirmed.  The Department of Children and Family Services's (DCFS) motion for dismissal of Harvey B.'s purported appeal from the juvenile court's July 2, 2012 order setting a section 366.26 hearing is granted and that part of Harvey B.'s appeal is dismissed.  DCFS's motion for judicial notice of the record and our prior opinion in *In re Lucas S.* (Sept. 22, 2011, B229906) is granted.  Harvey B.'s motion to strike his opposition to DCFS's "partial motion to dismiss" and to file an amended opposition is granted.  Harvey B.'s motion to take judicial notice of *In re David R.* (2012) 212 Cal.App.4th 576, review granted March 13, 2013, S208475, matter transferred June 12, 2013, with directions to us to vacate our decision and to reconsider the cause in light of *In re I.J.* (2013) 56 Cal.4th 766, is denied.

NOT TO BE PUBLISHED.


MALLANO, P. J.

We concur:


ROTHSCHILD, J.


JOHNSON, J.

16